UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 107-17 |
| | ) | |
| ALONZO BRAZIEL | ) | Hon. Elaine E. Bucklo |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT ALONZO BRAZIEL'S SENTENCING MEMORANDUM**

Less than a year after being released from federal custody following his conviction for mail fraud in this district, Alonzo Braziel purchased three properties using false income and employment information, false seller-second mortgages and undisclosed earnest money and kickbacks in connection with a $7.2 million mortgage fraud scheme. As a result of his lies and misrepresentations, lenders issued $351,000 in mortgage loans to Braziel and have suffered $191,600 in losses because Braziel failed to make his mortgage payments and the lenders foreclosed on his properties. When federal agents confronted Braziel on two separate occasions, he lied about his knowledge of and role in the mortgage fraud scheme. Additionally, after Braziel was made aware of the government's investigation into this mortgage fraud scheme, Braziel tried to bribe Keenan Haynes to create false employment documents to cover his tracks. On March 12, 2009, a jury convicted Braziel of three counts of mail fraud in connection with this mortgage fraud scheme.

The U.S. Probation Department has calculated Braziel's sentencing range as 46 to 57 months' imprisonment. On October 16, 2009, Braziel filed a position paper as to sentencing factors in which he challenges the application of the two-level enhancement for use of sophisticated means, pursuant to Guideline § 2B1.1. He also seeks a three-level minor role adjustment, pursuant to Guideline § 3B1.2. For the reasons explained below, the government respectfully requests that the

Court reject Braziel's challenges to the Guidelines' calculation and sentence him to a period of incarceration that is within the advisory Guidelines' range because it is sufficient, but not greater than necessary, to comply with the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a).

## I.     NATURE AND CIRCUMSTANCES OF THE OFFENSE

Beginning in or about January 2003 and continuing through in or about November 2005, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants charged in this case, including Alonzo Braziel, knowingly devised, attempted to devise, and participated in a scheme to defraud and to obtain money and property owned by and under the custody and control of banks and lenders by means of materially false and fraudulent pretenses, representations, and promises. Each co-defendant played a role material to the scheme's overall success. Braziel played an integral part in the scheme for the 3 loans at issue, since no one would have received any money in connection with those properties without a buyer. As a result of his receiving mortgage loans through his use of false information and documents, Braziel ensured that the recruiters and rehabbers were paid their expenses and turned a profit on those properties. He also profited from the scheme himself, receiving both kickbacks and properties. The jury convicted Braziel of three counts of mail fraud (Counts 17, 18, and 19) in connection with this mortgage fraud scheme committed by him and his 17 co-defendants.

As described in Braziel's Presentence Investigation Report ("PSR"), the attached Government's Version of Events, and as presented at trial, co-defendant Donald Thomas recruited Alonzo Braziel to purchase three properties using false information regarding his income, employment, and taxes: (1) 1430 Portland Avenue in Chicago Heights; (2) 7321 S. Evans Avenue

in Chicago; and (3) 14820-22 S. Hoyne Avenue in Harvey. PSR at lines 51-56. Braziel had just been released from jail and could not qualify for loans with true and accurate information, so he submitted and caused others to submit false documents, including verifications of deposit (VODs), verifications of rent (VORs), verifications of employment (VOEs), W-2 wage and tax statements, and pay stubs to support his false loan applications. PSR at lines 56-58. Among other things, Braziel falsely reported that he worked for A-OK Construction, a company owned by Keenan Haynes, who falsely confirmed Braziel's employment. PSR at lines 65-66. He also failed to list his restitution obligation as a liability on his loan applications.

Keenan Haynes testified during Braziel's trial and, prior to that, in the Grand Jury regarding an arrangement that he made with Braziel and Donald Thomas to falsely verify Braziel's employment. *See* Grand Jury Testimony of Keenan Haynes at 9-10, attached to Government's Version of Events as Exhibit B. Haynes testified that Braziel and Donald Thomas approached him, asking him if he would tell the mortgage lender that Braziel worked for his company, A-OK Construction. *Id.* at 10. In exchange, Braziel and Thomas offered Haynes $500 per property that Braziel purchased, and they wrote down what they wanted Haynes to tell the lenders. *Id.* Haynes was supposed to tell the lenders that Braziel had been working for A-OK Construction for 18 months as a General Manager, for an annual salary of $46,000. Haynes provided one false verification for Braziel that covered two properties, and Braziel was supposed to pay him $1,000. *Id.* at 10-11. Braziel ultimately paid Haynes only $800. *Id.*

In addition to the false documents and information that he used to obtain mortgages, Braziel also had a false seller-second mortgage payable to Larry Skrobot for each of his properties. Each of Braziel's HUD-1 settlement statements showed a seller-second mortgage, which was the

agreement that the buyer would pay the seller the difference between the contract sales price and the loan amount. As James Robert Thomas explained during the course of trial, however, each seller-second mortgage was false: Braziel did not have to pay Skrobot back the difference, and none of the defendants, including Braziel, informed the lenders of this side agreement.

As James Robert Thomas testified before the Grand Jury and at trial, Braziel was paid for purchasing the properties. *See* Grand Jury Testimony of James Robert Thomas at 36, attached to Government's Version of Events as Exhibit B. During trial, James Robert Thomas testified that he worked with co-defendant Donald Thomas to sell 1430 Portland to Braziel.[1] Specifically, James Robert Thomas told Donald Thomas that he would give Donald $5,000 and that Donald and Braziel could work out their own side deal. James Robert Thomas then testified regarding a fight that occurred at the closing table between Donald Thomas and Braziel in which Braziel complained that he was not getting paid enough money even though he was the buyer. James Robert Thomas told Braziel that his deal was with Donald Thomas, not with him, and that he had already paid for Braziel's pay stubs and W-2s. Based on his review of bank records, Special Agent Donald Kaiser also confirmed that Braziel received somewhere between $7,000 and $15,000 for his participation in purchasing the three properties. PSR at lines 89-90.

Keenan Haynes testified at trial that after Braziel was aware of the government's investigation in this mortgage fraud scheme, he approached Haynes, telling him that his lawyer[2] had recommended he obtain supporting documents should lenders question Braziel's statements on his

---

[1]The trial transcript for *United States v. Thomas, et al.*, has not yet been prepared. Record citations are therefore unavailable at this time.

[2]This reference is to Braziel's prior attorney, not Mr. Petro, his counsel of record in this case.

4

loan applications. Grand Jury Testimony of Keenan Haynes at 12. Braziel told Haynes that he was being looked at and asked Haynes to provide him with W-2 forms from A-OK Construction to support the income that he claimed on his loan application. *Id.* at 12-13. Braziel asked Haynes, "How much will it take?" *Id.* at 13. Haynes told Braziel that the FBI had called and that he did not want anything to do with the fraud that was going on. *Id.*

Braziel also attempted to conceal his role in the mortgage fraud scheme by lying when he was interviewed by law enforcement agents on October 12, 2005 and November 20, 2005. During those interviews, he falsely claimed that he worked for A-OK Construction and denied knowing that he had signed false loan applications or provided false information to lenders.

## II.    GUIDELINES CALCULATION

In his sentencing memorandum, Braziel objects to the application of the two-level enhancement for use of sophisticated means in the commission of the offense, pursuant to Guideline § 2B1.1(b)(9)(C). He also argues that he is entitled to a minor role reduction for his role in the offense, pursuant to Guideline § 3B1.2. Each of Braziel's arguments should be rejected.

### A.    The Sophisticated Means Enhancement Applies to Braziel.

Braziel objects to the sentencing enhancement for use of sophisticated means in the commission of the offense. "Offense conduct is sophisticated if it displays 'a greater level of planning or concealment' than a typical fraud of that kind." *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2008) (*citing United States v. Robinson*, 583 F.3d 605, 607 (7th Cir. 2008); *United States v. Fife*, 471 F.3d 750, 753-54 (7th Cir. 2006); *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007)).

5

In this scheme, which included at least eighteen participants with specialized roles, coordinated efforts, and the issuance of $7.2 million in fraudulent mortgage loans, Braziel caused the preparation of numerous false documents, including verifications of deposit, verifications of rent, verifications of employment, W-2 wage and tax statements, seller-second mortgages, and pay stubs to support his false loan applications. He then caused those false documents to be submitted in conjunction with fraudulent mortgage loan applications for three properties. He and his co-schemers, including James Robert Thomas and Donald Thomas, then ensured that other individuals, like Keenan Haynes, would confirm that false information if requested by lenders. Thus, Braziel's conduct warrants the two-level enhancement for sophisticated means. *See United States v. Cross*, 2008 WL 1723325 (7th Cir. Apr. 15, 2008) (affirming sophisticated means enhancement in mortgage fraud scheme involving 35 mortgage loans where false verifications of deposit were used for straw buyers and defendant arranged for closings to be held at two fraudulent title companies he had created).

Moreover, even if Braziel's individual actions as a buyer could not be characterized as sophisticated, the overall scheme, which involved at least eighteen individuals with different but integral roles, approximately 75 properties, and the issuance of $7.2 million in mortgage loans, was complex and sophisticated. Unlike the "common mortgage fraud scheme" involving inflated appraisals, false loan documentation, and/or kickbacks described in Braziel's position paper, this mortgage fraud scheme involved all of those elements coupled with verifications for every aspect of the loan documentation (including W-2 Forms, pay stubs, verifications of deposit, verifications of employment, verifications of rent, leases, and construction receipts), false earnest money payments, and false seller-second mortgages. This mortgage fraud scheme did involve "a greater

6

level of planning or concealment than a typical fraud of that kind." *Wayland*, 549 F.3d at 528. Moreover, there is no requirement that Braziel have known the scope of the entire scheme for the sophisticated means enhancement to apply, and Braziel has not cited any authority to the contrary. The enhancement is therefore appropriate for each participant, including Braziel. *See Wayland*, 549 F.3d at 529 (citations omitted) (adopting approach of other circuits in finding sophisticated means enhancement appropriate where overall scheme is complex and sophisticated even if defendant's individual actions to perpetrate scheme were unsophisticated).

**B.    Braziel Was Not a Minor or Minimal Participant in the Fraud Scheme.**

Braziel also seeks a three-level minor role adjustment for his role in the offense, pursuant to Guideline § 3B1.2, claiming that he is less culpable than most other participants in this mortgage fraud scheme.  Braziel focuses on the general description of him as a "nominee buyer for three properties," *see* PSR at line 149-50, while ignoring the extent of his role in the scheme.  Because Braziel was integral to the success of the fraudulent transactions in which he participated, he is not entitled to a minor role adjustment.

The government charged 18 defendants in this scheme; however, there were many more participants who were uncharged. For example, the government did not charge buyers who purchased fewer than two properties with false information, or persons who manufactured false documents for fewer than two properties, or persons who verified rent for buyers in fewer than two instances. Braziel, on the other hand, was charged because his role as a buyer and his involvement in multiple aspects of the fraud made him at least an average participant in the charged scheme. *See United States v. Patillo*, 131 Fed. Appx. 206 (11th Cir. 2005) (defendant who denied knowledge of full extent of scheme was not entitled to minor role reduction for falsifying documents for straw

7

purchasers); *United States v. Brown*, 136 F.3d 1176 (7th Cir. 1998) (defendant who participated in three fraudulent food stamp transactions was not entitled to minor role reduction).

As the buyer of three properties, Braziel had knowledge and understanding of the nature and scope of the mortgage fraud scheme, even if he did not know the precise extent of the fraud scheme. He knew that he could not qualify for a mortgage loan with his true information, so he submitted and caused others to submit false loan documents, including false verifications of employment, verifications or rent, and verifications of deposit, and loan applications on his behalf. He knew that co-defendants James Robert Thomas and Donald Thomas arranged to purchase false employment documents for him, which were then given to co-defendant Joseph Miller to be submitted to lenders. Braziel also had a role in obtaining at least some of his verifications, as he and co-defendant Donald Thomas recruited Keenan Haynes into the scheme by agreeing to pay him $500 in exchange for each verification of employment that he performed for Braziel. Admittedly, Braziel did not oversee or organize the remaining property purchases in the scheme like Larry Skrobot or James Robert Thomas, both of whom received leader/organizer enhancements for their roles in this scheme. Braziel, however, was not among the lowest level participants, "who provided false VOEs and documents, without creating said documents." PSR at 82-83. With regard to his own three purchases, his role and subsequent concealment were critical to the scheme's success. He was at least an average participant, since he paid for false documents, prepared false documents himself, used others' money to commit the crimes, and then attempted to conceal his conduct.

Morever, contrary to the inaccuracy in Braziel's position paper, the government presented evidence that Braziel was paid to buy the properties: James Robert Thomas' Grand Jury testimony ("Alonzo was paid for purchasing the properties, and Alonzo, Donald and I discussed what Alonzo

should be paid for purchasing 1430 Portland."); James Robert Thomas' trial testimony regarding his discussions with Braziel regarding the amount Braziel was being paid for his role; and the statements of Special Agent Donald Kaiser that Braziel received anywhere between $7,000 and $15,000 for his participation in the fraudulent sale of the three properties. *See* PSR at 87-90. In addition to the kickbacks that he received, as a result of his role in this fraud scheme, Braziel owned three properties, which had a total value of $351,000 when he purchased them. His knowledge of and involvement in multiple aspects of the scheme to defraud render him among the more culpable in this scheme and ineligible for a minor role reduction.

III.     **A GUIDELINES SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO ACCOMPLISH THE PURPOSES SET FORTH IN THE GUIDELINES AND 18 U.S.C. § 3553(a)**

Despite having a high school degree and periods of successful employment, Braziel has resorted to fraud and other criminal activity on multiple occasions and failed to learn from his mistakes. A sentence within the advisory Guidelines range, which Probation has calculated to be 46-57 months' imprisonment, is necessary to reflect the seriousness of this massive mortgage fraud scheme and the role Braziel played in obtaining mortgage loans for three properties and causing a loss of $191,600. A sentence within the advisory Guidelines range will also provide just punishment for the offense, since it reflects not only Braziel's involvement in the scheme, but also his efforts to conceal both the scheme and his role in it.

Moreover, a sentence within the advisory Guidelines range is necessary to specifically deter Braziel from committing further crimes. On November 16, 1998, Braziel pleaded guilty to attempting to obtain a controlled substance by fraud or deceit in Marion County, Indiana Superior

Court. He was sentenced to 545 days in custody, with 485 days suspended. His probation was discharged on April 27, 1999.

On February 13, 2002, however, Braziel pleaded guilty to mail fraud in connection with a scheme to defraud the Illinois Department of Employment Security of approximately $119,155 and was subsequently sentenced to 18 months' imprisonment. *See* PSR at lines 203-212. As stated in the PSR, that scheme to defraud occurred between 1997 and 1999, the same period of time in which he attempted to obtain a controlled substance by fraud or deceit and while he was on probation for that charge. Braziel was released from federal custody on February 26, 2004. PSR at line 204.

Despite his conviction for mail fraud in this district, Braziel almost immediately returned to fraudulent activity upon his release from federal custody. Braziel purchased his first property in this scheme in December 2004, less than a year after he got out of prison, and while he was on supervised release. His involvement in the fraud in this case even preceded the closing date, as he and his co-schemers prepared and obtained the false loan documentation to support his fraudulent loan applications. Braziel did not learn from his prior experience with the federal criminal justice system. If anything, Braziel learned to be more proactive in his efforts to conceal and disguise his involvement in fraud. A sentence within the advisory Guidelines range is therefore sufficient, but not greater than necessary, to achieve the purposes set forth in the Guidelines and § 3553(a).

IV.    **A SENTENCE WITHIN THE ADVISORY GUIDELINES RANGE WILL AVOID UNWARRANTED SENTENCING DISPARITIES AND GENERALLY DETER MORTGAGE FRAUD**

On February 5, 2008, the government filed two indictments, charging 22 defendants with scheming to commit mortgage fraud.[3] For many reasons, the indictments were divided into the two cases, and this case charged 18 defendants. This case involves $7.2 million in loans ($1.6 million of which involved Thomas) and 75 real estate transactions (14 of which involved Thomas), while the *Melvin* case involves $20 million in loans and 99 real estate transactions. To date, all four *Melvin* defendants have been sentenced and eleven *Skrobot* defendants have been sentenced, as follows:

1.    *United States v. Melvin*

Lawrence Melvin, a recruiter and loan officer, received a Guidelines sentence of 78 months. Melvin had cooperated in his case, but before sentencing admitted he had lied in the grand jury when he overstated his co-defendant's role in the offense. In giving Melvin a low-end sentence, the Court explained that Melvin's extraordinary military service (including saving an injured soldier from near-certain death during battle) weighed heavily in his favor and against his lies under oath.

Sean Chaney, a recruiter, received a mid-range Guidelines sentence of 84 months in prison. In his plea agreement, he admitted that banks and lenders issued mortgage loans to the buyers of approximately 35 properties for an amount totaling approximately $9,159,362. The losses associated with those properties was more than $2.5 million but less than $7 million.

---

[3]As the Court is aware, the government also indicted three defendants in *United States v. Henderson*, 08 CR 106. The indictment in *Henderson* charged the three defendants in a money laundering conspiracy. One of the defendants, Nowell Patrick Lando, admitted to engaging in mortgage fraud in connection with this case. Lando was sentenced to a within-range sentence.

Maria Vega, a loan processor who was trained by and worked primarily for Melvin, received a sentence of four years probation and a $1000 fine. In sentencing Vega to a below-Guidelines sentence, the Court explained she made no decisions on her own, and her loss amount was inflated due to her relationship with Melvin. The Court also noted Vega's traumatic childhood, including sexual abuse, caused her to engage in the offense conduct.

Mary Dochee provided false verification of employment for one property, and was, at the end of the day, he least culpable person charged overall, in both cases. The Court sentenced her to 4 months home confinement and 2 years probation, noting her very minimal role in the overall offense.

### 2. *United States v. Skrobot*

Kevin Earl provided false verifications of employment on three occasions, and for that conduct was defendant number 18 of the 18 defendants charged in the *Skrobot* case. He received a Guidelines sentence of 18 months in prison, which he is serving concurrent with a previously-imposed state sentence.

Diane Robinson obtained false pay stubs and W-2s to qualify buyers for loans they were otherwise not qualified to receive. She also arranged for, and paid for, false verifications of employment through co-defendant Kevin Earl's company, the Art of Construction, and she recruited Earl into the scheme. Robinson also purchased false W-2s and pay stubs relating to two companies (National Handicap Workshop and South Shore Imports) to qualify at least four other buyers for loans for which they otherwise would not have qualified. Robinson received a Guidelines sentence of 21 months in prison.

12

Karl Allen sold false employment documents, including pay stubs and IRS Forms W-2, to James Robert Thomas. These documents were submitted to lenders to qualify buyers for loans to which they were not entitled. Allen received a Guidelines sentence of 33 months in prison.

Johnny White falsely verified employment for 6 buyers, resulting in a loss of $213,750. For his relatively minor (but important) role in the offense, White was sentenced to 366 days in prison, 200 hours of community service and a $1000 fine. In sentencing White to a term of imprisonment below the applicable advisory Guidelines range, the Court noted that in contrast to every other defendant charged, White has devoted his entire life to community service. In addition, White's felony conviction may impact his community service organization's ability to enter into contracts or provide services to the poor and disabled community, a significant penalty.

James Green purchased four properties using false documents and information, and his false representations caused $322,500 in loans (and $189,500 in actual losses) to lenders who relied on his false statements in issuing loans to him. Green lied when confronted by law enforcement officers, and again lied under oath to a jury when he testified in his own defense at trial. This Court sentenced Green to a Guidelines sentence of 37 months in prison.

Charline Batalla processed $4.3 million in loans (resulting in $1.2 million in losses) for Varena McCloud at Equity Express. On 34 files, she (together with McCloud) was the liaison between the lender and the buyer, and in that capacity obtained a variety of false documents to qualify buyers for loans to which they were otherwise not entitled. Batalla has no other criminal history, was young when she committed the offense and immediately confessed when confronted with her criminal activity. She testified in the grand jury and offered her assistance at both trials relating to the indictment in this case. At her sentencing, the government moved for a 1/3 reduction

13

in her sentence, for a total term of 27 months imprisonment. The Court cited Batalla's young age and tough family circumstances and sentenced her to a below-range sentence of 22 months in prison.

James Robert Thomas was sentenced to a Guidelines sentence of 39 months in prison. Thomas recorded numerous conversations and assisted the government in charging several of Skrobot's co-defendants as well as the defendants in *United States v. Henderson*, Case No. 08 CR 106. He has testified at four trials and is expected to testify in one more. For his extensive and extraordinary cooperation, the government moved for a sentence of 50% of the low end of his Guidelines range. Thomas, who worked hand in hand with Skrobot, received a four-level enhancement for organizing and leading this scheme.

Donald Thomas was a rehabber involved in 12 property purchases resulting in $597,100 in loans. He recruited Keenan Haynes and Alonzo Braziel into the scheme, and he purchased false documents to qualify Braziel, Dallas Green and James Green for loans. His personal history and characteristics were only extraordinary because of his advanced age at the time he committed the offense. His 53 month sentence was 4 months below the applicable Guidelines range.

Jonathon Marchetti was another rehabber involved in 15 property purchases resulting in $326,200 in loans. Skrobot mentored Marchetti, teaching him how to obtain a false loan, encouraging him to recruit other buyers and introducing him to loan officer Joseph Miller (who directed Marchetti to create false documents to obtain funds). Marchetti questioned Miller's demands, and then sought advice from Skrobot, who gave him the assurances he needed to continue to commit fraud. Marchetti also recruited and directed co-schemer Alfredo Hilado, who purchased 8 properties. Marchetti cooperated with the government's investigation, and at sentencing, the government moved for a 33% variance from the low end of his Guidelines range. The Court

sentenced him to 14 months in prison, 4 months less than the applicable low end of his range. In doing so, the Court noted Marchetti's strong family support and lack of any criminal background whatsoever.

Joseph Miller was a licensed loan officer who fraudulently enriched himself and his co-schemers at the expense of banks and mortgage lenders. In that capacity, he facilitated fraudulent loans for approximately 22 properties, resulting in $724,200 in actual realized losses to date. The Court sentenced him to an advisory Guidelines sentence of 48 months' imprisonment.

Larry Skrobot, with James Robert Thomas, was one of the leaders and organizers of this mortgage fraud scheme, and for his role, received a leader/organizer enhancement. Skrobot was personally involved in fifty-nine properties and an actual loss of $1,744,650. During the course of the scheme, he purchased and submitted false documents, caused others to do the same (or, when consulted, told others it was okay to do so), arranged for the submission of false loan application packages, recruited and managed other criminal participants and failed to inform lenders about his financial arrangements with transaction participants. The Court sentenced him to an advisory Guidelines sentence of 78 months' imprisonment.

### 3. Nationwide Sentences

In *United States v. Woods*, the Seventh Circuit directed Courts to consider nationwide sentencing disparities when deciding the sentence to impose upon a defendant. *United States v. Woods*, 556 F.3d 616, 623 (7th Cir. 2009) ("we do not view a discrepancy between sentences of codefendants as a basis for challenging a sentence . . . we look at a disparity only of it is between the defendant's sentence and all other similar sentences imposed nationwide.") A survey of national mortgage fraud cases yielded the following results of cases in which the defendant submitted false

15

information and/or documents to obtain a loan, or where the defendant at issue provided money to buyers to use as a down payment to purchase property, and were sentenced <u>within the guidelines range</u>: *United States v. Berkley*, 333 F.3d 776 (7th Cir. 2003); *United States v. Demetz*, 219 Fed. Appx 206 (11th Cir. 2005); *United States v. Austin*, 70 F.3d 1282 (10th Cir. 1992); *United States v. Woods*, 554 F.3d 611 (6th Cir. 2009); *United States v. Wilkins*, 308 Fed. Appx 920 (6th Cir. 2009); *United States v. Ellis*, 161 Fed. Appx. 17 (D.C. Cir. 2005); *United States v. Amico*, 416 F.3d 163 (2d Cir. 2005) (mortgage broker); *United States v. Parker*, 280 Fed. Appx. 899 (11th Cir. 2008) (loan officer).

Compared to these cases as well as Braziel's co-schemers, any sentence below the Guidelines range would create a disparity unwarranted by his crimes and his characteristics, and would send a signal that massive fraud schemes do not deserve just punishment. Braziel profited from his role in both cash and properties. He has shown no remorse for his conduct. Moreover, when confronted by federal agents, he lied about his knowledge of and involvement in this mortgage fraud scheme and tried to bribe another participant to conceal his role in the scheme. He is also the most typical mortgage fraud defendant, *i.e.*, an unqualified buyer resorting to lies to obtain funding and properties to which he was not entitled. There are no extraordinary circumstances here, unlike with White, Vega, and Melvin. If anything, Braziel is most similar to co-defendant James Green, another buyer in this scheme, who was responsible for obtaining fraudulent mortgage loans in connection with his purchase of four properties. James Green received a Guidelines' sentence. To accomplish the interests set forth in the Guidelines and in 18 U.S.C. § 3553(a), Braziel should receive a Guidelines sentence as well.

VI.     **CONCLUSION**

To adequately account for the nature of this massive fraud and Braziel's role in the scheme, to specifically deter Braziel from committing future crimes, to avoid sentencing disparities, and to deter similar conduct by others, the government respectfully requests that Braziel receive an advisory Guidelines sentence.

Dated: October 20, 2009

                                        Respectfully submitted,

                                        PATRICK J. FITZGERALD
                                        United States Attorney


                                        By: /s/Megan Cunniff Church
                                            LISA M. NOLLER
                                            MEGAN CUNNIFF CHURCH
                                            Assistant United States Attorneys
                                            219 South Dearborn Street
                                            Chicago, Illinois  60604
                                            (312) 886-1173